UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VERA GADMAN,<br><br>                Plaintiff,<br><br>  v.<br><br>JOSEPH MARTIN; MARSHALL DITTRICH; PENELOPE JAMES; and PHOENIX MOUNTAIN COLLABORATIVE, LLC.,<br><br>                Defendants. | Case No. 2:13-CV-00327-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Pending before the Court in the above-entitled matter are Defendants', Phoenix Mountain Collaborative, LLC and Penelope James, Motion for Summary Judgment and related Motions. The parties have filed their responsive briefing and the matters are ripe for the Court's consideration.[1] Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the

---

[1] Mr. Dittrich filed a response to Plaintiff's opposition to the Motion for Summary Judgment wherein he takes no position on the Motion but responds only to clarify the record. (Dkt. 17.)

**MEMORANDUM DECISION AND ORDER - 1**

decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

In the summer of 2011, Defendants Joseph Martin and Marshall Dittrich were participants in a 52-day outdoor program known as the Big Sky Summer Adventure Program operated by Explorations in Trout Creek, Montana. Explorations is an entity that offers both full time residential programs and summer outdoor adventure programs for youths who may have struggled in the past either academically, socially, with interpersonal relationships, or with substance use/experimentation issues. Explorations also offers counseling sessions and life skills training. Explorations is owned and operated by Defendant Phoenix Mountain Collaborative, LLC.[2] The Defendant Penelope James is the managing member of Explorations who reviews the applications for enrollment at Explorations' camps.

On July 29, 2011, the Explorations outdoor program was finishing a float trip down the Clark Fork River which runs from Montana to Idaho. That evening, around 10:00 p.m., the students and staff camped out on the Explorations' property. The next morning around 8:00 a.m., an Explorations' staff member noticed Mr. Martin and Mr. Dittrich were missing. A search was conducted but the boys were not found on the property. At 9:30 a.m. Ms. James notified local law enforcement and the boys' parents that they had run away and were missing.

---

[2] The Court will refer to Phoenix Mountain Collaborative, LLC as "Explorations" in this Order. The Court also refers to both Ms. James and Explorations collectively as "Explorations" in this Order.

The location of the two boys was not known until July 31, 2011. On that day the Plaintiff, Vera Gadman, was driving her vehicle in Clark Fork, Idaho when she saw Mr. Martin and Mr. Dittrich, hitchhiking along Highway 200. Ms. Gadman stopped her car and offered them a ride. The boys asked Ms. Gadman to take them somewhere they could camp. After driving to a couple of locations, Ms. Gadman stopped at the east end of David Thompson Road and showed the boys where they could camp on a map. At that stop, Mr. Martin and Mr. Dittrich then brutally assaulted and battered Ms. Gadman including allegedly choking, strangling, and striking her in the head with a glass bottle, throwing and striking her with rocks, and committing other acts of violence and terror against her. (Dkt. 1 at ¶ 13.) As a result, Ms. Gadman claims she suffered serious physical and emotional injuries and incurred significant damages. Ms. Gadman has filed this action raising a negligence claim against the Defendants seeking to recover for the damages she suffered from the attack. Defendants Exploration and Ms. James have filed this Motion for Summary Judgment which the Court takes up in this Order.

**STANDARD OF REVIEW**

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a completely failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.[3]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. V. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

---

[3] *See also,* Rule 56(3) which provides, in part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**MEMORANDUM DECISION AND ORDER - 4**

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

Of course, when applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

## ANALYSIS

**1.     Motion for Extension of Time to File Statement of Genuine issues of Fact**

Plaintiff's Motion asks for leave of the Court to file a late Statement of Genuine Issues of Fact in response to the Motion for Summary Judgment. (Dkt. 23.) Plaintiff mistakenly failed to file the Statement of Fact as required by the rules. Defendants oppose the Motion arguing the proposed Statement of Facts fails to satisfy the requirements of Federal Rule of Civil Procedure 56(c) and Local Civil Rule 7.1. (Dkt. 24.) The Court has reviewed the briefing and materials on this issue and will grant the Plaintiff's Motion and allow her to file the late Statement of Facts. While the filings is untimely, the Court finds the interests of justice are best served by deciding the Motion for Summary Judgments on its merits and there is little prejudice suffered by Defendants as a result of the late filing.

## 2. Defendants' Motion for Summary Judgment

Explorations and Ms. James seek dismissal of the negligence claim against them arguing 1) they owed no duty to Ms. Gadman and 2) the actions of Mr. Dittrich and Mr. Martin were not foreseeable to either Explorations or Ms. James. (Dkt. 16.) Ms. Gadman opposes the Motion and asserts that a genuine issue of material fact exists as to whether Explorations and/or Ms. James owed a duty to her. (Dkt. 19.)

On the question of whether Ms. James and/or Explorations owed a duty of care to Ms. Gadman under Idaho law, both parties cite to and discuss *Caldwell v. Idaho Youth Ranch, Inc.*, 968 P.2d 215 (Idaho 1998) but arrive at opposite conclusions. In *Caldwell*, the Idaho Supreme Court held that the Idaho Youth Ranch did not owe a duty of care to a third-party for the violent acts committed upon the third-party by a minor who had, several months prior, been released from an Idaho Youth Ranch program. There the court concluded that the minor was not in the custody or control of the Youth Ranch at the time he committed the violent acts upon the third-party.

In reaching this conclusion, the Idaho Supreme Court discussed the "duty owed by those in charge of persons who are dangerous or who have dangerous propensities," quoting the duty is as described in the Restatement (Second) of Torts, § 319, which provides:

> **§ 319. Duty of Those in Charge of Person Having Dangerous Propensities.**
> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

*Caldwell*, 968 P.2d at 218 (quoting Restatement (Second) of Torts, § 319 (1977)). The court then identified the two components of the duty:

> The first part requires a determination of whether the supervising body actually has control over the individual in question, and then secondly, if so, a determination must be made whether the harm caused by the individual was foreseeable.

*Id.* at 218-19. The parties in this case dispute both components – whether Ms. James/Explorations had control over the boys and whether the harm caused by the boys was foreseeable.

### A. Control

"No liability exists under the law of torts unless the person from whom relief is sought owed a duty to the allegedly injured party." *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Vickers v. Hanover Constr. Co., Inc.*, 875 P.2d 929, 932 (Idaho 1994)). "Ordinarily, 'there is no affirmative duty to act to assist or protect another absent unusual circumstances, which justifies imposing such an affirmative responsibility. An affirmative duty to aid or protect arises only when a special relationship exists between the parties.'" *Rees v. State, Dept. of Health and Welfare*, 137 P.3d 397, 402 (Idaho 2006) (quoting *Coghlan v. Beta Theta Pi Fraternity*, 987 P.2d 300, 311 (1999)) (citations omitted). "Determining when a special relationship exists sufficient to impose an affirmative duty requires an evaluation of 'the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection.'" *Id.* (quoting *Coghlan*, 987 P.2d at 311 (quoting W. Prosser, Law of Torts 333 (3d ed. 1964))).

**MEMORANDUM DECISION AND ORDER - 7**

> The general duty which arises in many relations to take reasonable precautions for the safety of others may include the obligation to exercise control over the conduct of third persons.... [Some] relationships are custodial by nature, requiring the defendant to control his charge and to guard other persons against his dangerous propensities.... The same rule has been applied to hospitals and psychotherapists who have charge of dangerous mental patients, and to those who have charge of dangerous criminals. ... Yet, in the absence of the requisite relationship, there generally is no duty to protect others against harm from third persons.

*Caldwell*, 968 P.2d at 218 (quoting *Sterling*, 723 P.2d at 768–69) (citation omitted). "[T]he key to this duty is the supervising individual's relationship to the supervised individual, rather than a direct relationship with the endangered person or class of persons." *Caldwell*, 968 P.2d at 218 (discussing *Sterling v. Bloom*, 723 P.2d 755, 769 (Idaho 1986) superseded in part on other grounds by Idaho Code § 6–904A)). Thus, the duty alleged in this case would have to arise from a supervisory relationship where Ms. James/Explorations exercised some level of control over Mr. Martin and Mr. Dittrich.

The parties in this case disagree on the level of "control" Explorations had over the youths. Explorations argues that it provides "recreational programs and counseling for children" but maintains it is "not a state run juvenile detention center or institution." (Dkt. 16 at 1, 9.) Participation in Exploration is voluntarily and there is no physical detention or connection to the criminal justice system. (Dkt. 16 at 2, 9.) Explorations' briefing argues that the attendees may leave the Exploration program at any time. (Dkt. 16 at 9.)

Ms. Gadman counters that Explorations and Ms. James exercised supervisory control over the students such that a special relationship was formed which gives rise to a duty. (Dkt. 19.) Ms. Gadman points out that Ms. James testified in her deposition that students are not

**MEMORANDUM DECISION AND ORDER - 8**

free to leave Explorations once they are enrolled, there had been kids in the past who had ran away from camp but were caught, and described the procedures Explorations had in place for preventing kids from escaping.

The Court finds facts in this case are distinct from those in *Caldwell* where it was undisputed that the violent offender had been released from the Idaho Youth Ranch several months before committing the murder. There the Idaho Supreme Court found the Idaho Youth Ranch did not have control over the offender such that a duty of care was owed. In contrast here, Explorations did have control over Mr. Martin or Mr. Dittrich and had not released them from its custody – they ran away.

Although it is not akin to a juvenile detention facility, Explorations was responsible for the care and custody of the youth participants in its programs. The minor participants could not leave the program without their parents' permission. When asked if the participants of the outdoor program were "free to leave," Ms. James stated in her deposition that participants who were minor could only leave if they had their parents' permission, otherwise they were not free to leave.[4] (Dkt. 19-10 at 12.) Ms. James went on to state that the steps taken to assure participants do not leave are that "care is provided, oversight and care, with our instructor team the entire time the students are there." (Dkt. 19-10 at 13.)

Participants have ran away from Explorations in the past. Explorations has run away prevention measures called "Run Watch" which are written set of procedures and guidelines designed for responding to a runaway or missing student. (Dkt. 19-10 at 28-29) (Dkt. 19-6,

---

[4] Both Mr. Martin and Mr. Dittrich were seventeen at the time they were at Explorations.

**MEMORANDUM DECISION AND ORDER - 9**

Ex. F.) The Run Watch Policy states: "Explorations will take all reasonable precautions pertinent to each individual student so as to reduce the possibility of their escape from our custody." (Dkt. 19-10 at 30) (Dkt. 19-6, Ex. F.) Under the Run Watch guidelines, one instructor in each group has a "run kit" which is intended to provide the instructor in pursuit of the student with whatever equipment that would be necessary to ensure the safety of the instructor. (Dkt. 19-10 at 30) (Dkt. 19-6, Ex. F.) A student is placed on Run Watch when: the student just had a run attempt; the student verbalized a threat to do so; the instructional team perceives a student to be a run threat; or escorts, operations directors, or a therapist suggests it. (Dkt. 19-6, Ex. F.) Explorations also has written procedures for handling the situations involving an "Accompanied Runaway" and an "Unaccompanied Runaway/Missing Student." (DKt. 19-6, Ex. F.)

In this case, Explorations was aware the boys had planned to leave and actually took measures to thwart their plan by taking their shoes and journals. When their shoes were later returned, the boys executed their plan to run away from Explorations. The attack upon Ms. Gadman occurred two days after the boys left Explorations. While Explorations may not be akin to a juvenile detention facility, it is in charge of the custody and care of the children who are participating in its programs. This includes more than merely providing shelter, food, and programing. The relationship between Explorations and Mr. Dittrich and Mr. Martin was custodial. The Court finds upon these undisputed facts that Mr. Martin and Mr. Dittrich were in the custody and control of Explorations at the time of the attack. The Court next considers the second duty requirement: whether the harm caused by the individual was foreseeable.

**MEMORANDUM DECISION AND ORDER - 10**

B. **Foreseeable Actions**

"The question whether a risk of harm is foreseeable is generally a question for the trier of fact. Summary judgment is appropriate, however, if evidence is presented establishing the absence of any genuine issue of material fact concerning the general risk of harm." *Caldwell*, 968 P.2d at 220 (citation omitted). Under the Idaho Tort Claims Act, "Foreseeability, 'contemplates more than the mere possibility of aggressive tendencies.... The concept of foreseeability is much more narrowly drawn in this circumstance, ... i.e. violence, particularly of a sexual nature, toward members of the public ... must be manifest or ostensible, and highly likely to occur.'" *Caldwell*, 968 P.2d at 220 (quoting *Harris v. State Dep't of Health and Welfare*, 847 P.2d 1156, 1160 (Idaho 1992)). In *Caldwell*, the Idaho Supreme Court recognized that "human behavior is difficult to predict with certainty, leading to the necessity for claimants to demonstrate that the harmful behavior should have been highly predictable based upon demonstrated past conduct." 968 P.2d at 220 (citing cases).

Ms. Gadman argues Mr. Martin's and Mr. Dittrich's violent acts were foreseeable because both had a prior history of drug abuse and had previously attended treatment programs. (Dkt. 19.) Mr. Dittrich had also previously ran away from home and his school records include a history of "explosive and unpredictable behavior." While at Explorations, Ms. Gadman points out that Mr. Martin had stole medications from an unlocked Explorations travel van which he ingested and then went an entire week without sleeping causing him to behave erratically and hallucinate. These factors known to Explorations, she argues, made their attack on her foreseeable.

**MEMORANDUM DECISION AND ORDER - 11**

### i. Mr. Martin's and Mr. Dittrich's Prior Histories

Prior to attending Explorations, Mr. Martin had serious substance abuse issues that his parents knew of and he had been enrolled in different treatment programs. (Dkt. 19-8 at 7-16, 32-33.) Explorations and Ms. James were aware of Mr. Martin's prior drug problems. In his deposition, Mr. Martin testified that after arriving at Explorations he talked with Ms. James about the problems that had brought him to the program including his prior drug use. (Dkt. 16-4 at 33-34.) Mr. Dittrich also had behavior issues having been previously kicked out of school, ran away from home, and had also previously attended treatment programs. (Dkt. 19-9 at 7-9.)

Prior to the assault on Ms. Gadman, however, neither Mr. Martin nor Mr. Dittrich had any criminal history. (Dkt. 16-4 at 39, 54) (Dkt. 18 at 56.) Mr. Martin testified in his deposition that he was "unaware" he had any type of propensity for violent behavior prior to the attack and stated he had never been violent before the incident with Ms. Gadman. (Dkt. 16-4 at 39-40.) Mr. Dittrich testified that neither he nor his parents ever told Explorations about any propensity for violence. (Dkt. 18 at 57.)

Although the boys had struggled in various aspects of their lives before attending Explorations, there is nothing in their histories that was known to Explorations that made their actions on July 31, 2011 foreseeable. (Dkt. 16-2, Aff. James.)

### ii. Conduct at the Explorations Program

#### a. No Violent or Threatening Behavior

There is no evidence that either Mr. Martin or Mr. Dittrich engaged in any threatening or violent actions while at Explorations. In his deposition, Mr. Martin denied having committed any violent acts or threatening anyone while at the Explorations camp. (Dkt. 16-4 at 40-41.) Mr. Martin also testified he never observed Mr. Dittrich commit any violent acts or threaten anyone while he was at Explorations. (Dkt. 16-4 at 41.) In her affidavit, Ms. James states that she had not witnessed and there had been no reports that either boy had demonstrated any acts of aggression or violence to anyone at Explorations. (Dkt. 16-2 at ¶¶ 12-14.)

#### b. Mr. Martin's Theft of Drugs

When he arrived at Explorations, Mr. Martin had been off drugs for less than two months. (Dkt. 16-4 at 46-47.) Mr. Martin stated he began using drugs again within a few days of being at Explorations by taking drugs located in the Explorations van. (Dkt. 16-4 at 18-19, 47-48, 62-63.) The Explorations' staff learned that someone had taken drugs from the van and they confronted the group about it. (Dkt. 19-8 at 49-52.) At that time, Mr. Martin denied taking the drugs but testified that a couple of days before he ran away from camp he vaguely told one of the staff members that he had taken the drugs from the van and was "freaking out," or "bugging out a little" and "hearing things." (Dkt. 19-8 at 50-52, 64, 70.) Ms. James also testified that Mr. Martin had admitted to stealing pills from the Explorations van approximately ten days before he walked away from the program. (Dkt. 19-10 at 55-56.) Ms.

James testified that after Mr. Martin admitted to taking the pills, she assumed that someone had ingested the pills. (Dkt. 19-10 at 106.) Mr. Martin testified that he had taken the drugs before Explorations knew of the boys' plan to runaway. (Dkt. 19-10 at 97.)

The theft and taking of the medications from the Explorations' van does not make the violence committed upon Ms. Gadman foreseeable. Clearly Mr. Martin's behavior was out of line, but there were no indications that he would soon become aggressively violent such that the actions he took on July 31, 2011 were foreseeable to Explorations.[5]

As to the fact that Mr. Martin was hallucinating from the drugs, again the Court finds the undisputed facts do not give rise to anything that would have made Mr. Martins' later violent actions foreseeable. Mr. Martin testified that after he had lied to the Explorations' staff and repeatedly denied being the one who took the drugs, a day or two before they ran away he "mentioned" to staff that he was "freaking out" and "bugging out." (Dkt. 19-8 at 51-53.) In describing what he told the Explorations' staff, Mr. Martin testified that he "wouldn't even call it a conversation. I mentioned I was freaking out a little" and that he "didn't tell them I needed anything. I didn't ask for help." (Dkt. 19-8 at 52-53.) There is simply no basis from these facts from which Explorations could have predicted Mr. Martin would soon commit the violent assault upon Ms. Gadman. The fact that he stole drugs, ingested them, and was experiencing the side effects of the drugs does not make it highly predictable or

---

[5] In support of her response brief, Ms. Gadman has filed articles discussing the side effects of the drug Adderall, lack of sleep, and the connection between drugs and violence. (Dkt. 19, Ex. A, B, C.) Defendants have objected to the Court's consideration of these exhibits arguing they are inadmissible. The Court agrees that the articles are not appropriate for consideration pursuant to Federal Rule of Civil Procedure 56(c).

**MEMORANDUM DECISION AND ORDER - 14**

likely that he would become violent; particularly since there was no known history of any violent behavior either prior to Mr. Martin attending Explorations program or while he was at the program.

### c. The Plan to Run Away

Explorations' field staff had learned of Mr. Dittrich's and Mr. Martin's plan to runaway on either July 19th or 20th. (Dkt. 19-10 at 40, 96.) Once they learned of the boys' plan to leave, the Explorations' staff confronted the boys about their plan and then instituted a lockdown. (Dkt. 19-8 at 22, 70-71) (Dkt. 19-9 at 19.) During the lockdown the two were separated in the campsite, the staff took away their shoes and journals, and did not allow them to talk to anyone else. (Dkt. 19-9 at 19.) Mr. Dittrich testified that they were later given back their shoes to use on the white-water rafting trip. (Dkt. 19-9 at 30-31.)

That they had planned to run away from Explorations and find drugs does not make their subsequent violent attack upon Ms. Gadman foreseeable. If anything, the plan and the drug use without any violence was consistent with the boys' known histories. Ms. Gadman asserts that the violence was foreseeable because the boys would necessarily have to steal in order to obtain the drugs and other life necessities. The Court finds that argument is too speculative. In fact just the opposite proved to be true in light of the fact that the boys were given rides and marijuana from others when they were on the run all without them having to commit any violent acts. (Dkt. 19-9 at 37.)

Ms. Gadman also argues Mr. Dittrich's second journal contained a list of items and supplies they would need when they left the program making the resulting assault

**MEMORANDUM DECISION AND ORDER - 15**

foreseeable. (Dkt. 19 at 15.) (Dkt. 19-9 at 20-30, 78.) Mr. Dittrich testified that the staff at Explorations was not aware of his list. (Dkt. 18 at 78.) He further stated that the references to a knife, gun, and weapon in general were not intended to be used as a weapon against another person but for protection. (Dkt. 18 at 79-81.) Ms. Gadman asserts the staff should have looked at Mr. Dittrich's second journal and discovered the "disturbing information." (Dkt. 19 at 15.) This argument is also too speculative. The journal entries were started two to four days before the boys ran away and then later completed after the boys had left Explorations. (Dkt. 19-9 at 29.) While it may seem obvious in hindsight to argue that Explorations should have looked at Mr. Dittrich's second journal, the fact remains that Explorations was not aware of the journal entries and there are no facts going to show that they should have foreseen any future violent acts by these boys.

### C. Conclusion

The Court finds there is no genuine issue of material fact that supports a finding that Explorations and/or Ms. James could have foreseen the violent attack committed upon Ms. Gadman. Even considering the cumulative facts known by Explorations – i.e. the boys' prior history, Mr. Martin's theft and use of the drugs while at the camp, and their plan to run away – the violent assault on Ms. Gadman was not foreseeable. It is simply too attenuated to expect Explorations to have foreseen the attack based on what they knew about the boys prior to their running away.

Neither boy had any history of violent behavior or any criminal history. In reviewing both boys' applications, Ms. James interviewed each of the boys' parents, therapists, and educational consultants. None of these contacts conveyed any concerns that either boy was violent, likely because neither boy had any prior history of violence. While at Explorations, the boys did not commit any acts of violence or demonstrate any aggression. Although Explorations was aware of Mr. Martin's history of substance abuse, that fact, even when considered in the context of the totality of the circumstances known by Explorations, does not make his later violent actions foreseeable. As to the fact that one of Mr. Dittrich's schools had scored him at the highest end of "explosive and unpredictable behavior," that notation was made eleven years before he attended the Explorations program. (Dkt. 19-10 at 80.) The Court finds the undisputed facts establish that the boys' violent attack was not highly predictable or likely and, therefore, was not foreseeable. *See Caldwell*, 968 P.2d at 220.

It is notable that at the time they left the program the boys themselves had not even decided where they were going let alone contemplated attacking anyone. Mr. Martin testified that when they left Explorations his intention was just to get to a city so he could use drugs again but denied he had any intention of committing violence on anyone. (Dkt. 16-4 at 42.) It was not until after the boys had left Explorations that they discussed stealing a car and assaulting someone to get a car. (Dkt. 16-4 at 43-44.) If they themselves did not know or had not yet decided to commit a violent action, there certainly is no way the staff at Explorations could have foreseen the actions such that anyone could say the violence was "highly likely to occur." *Caldwell*, 968 P.2d at 220 (citation omitted). Because there is no genuine issue of

**MEMORANDUM DECISION AND ORDER - 17**

material fact in dispute that show Explorations and/or Ms. James could have foreseen the violent actions of Mr. Martin and Mr. Dittrich, the Court finds they did not owe a duty of care to Ms. Gadman. The Motion for Summary Judgment is granted.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Plaintiff's Motion to Extend Time (Dkt. 23) is **GRANTED**.

2) Defendants' Motion for Summary Judgment (Dkt. 16) is **GRANTED**. The claim against Defendants Phoenix Mountain Collaborative, LLC and Penelope James is **HEREBY DISMISSED**.

.

DATED: **June 17, 2014**

*Edward J. Lodge* (signature)

Honorable Edward J. Lodge
U. S. District Judge